STANDARD COAL CO. v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 5127. Decided December 14, 1932. (16 P. [2d] 926.)

A. R. *Barnes*, of Salt Lake City, for plaintiff.

*Geo. P. Parker*, Atty. Gen., and M. *Logan Rich*, Deputy Atty. Gen., for defendants.

ELIAS HANSEN, J.

Pursuant to an application for compensation and hearings had thereon, the Industrial Commission of Utah found that Henry Haataja is permanently and totally disabled as a result of an injury which he sustained on June 18, 1924, while employed as a miner by the Standard Coal Company, a self-insurer subject to the Industrial Act of this state (Comp. Laws 1917, § 3061 et seq., as amended). Haataja was awarded compensation payable by the Standard Coal Company at the rate of $16 per week during the remainder of his life. The coal company has brought the case here for review. It seeks to have award annulled, because, as it claims: (1) The commission was without jurisdiction to entertain the last application made by Haataja, because he had at the time the application was filed been fully paid for the injury which he sustained; (2) the evidence does not show that he is permanently and totally disabled; (3) the evidence shows that such disability as he has sustained can readily be removed by an operation which the coal company has offered and still offers to have performed.

The record brought here for review contains numerous medical reports, a mass of correspondence, and transcripts of evidence taken in a number of hearings had before the commission. Hereafter in this opinion we shall refer to Mr. Haataja as the applicant, to the Standard Coal Company as the company, and to the Industrial Commission of Utah as the commission.

Nearly seven years elapsed between the time that the applicant was injured and the time his case was finally disposed of by the commission. Following is a summary of the record which is brought here for review: The applicant was injured on June 18, 1924, while employed as a miner in

the coal mine of the company at Standardville, Carbon county, Utah. His injury consisted in his abdomen being crushed and his intestines being perforated in twelve or thirteen places. Immediately after his injury he was removed to the hospital where the perforations were sutured and the necessary treatment given by Dr. J. C. Hubbard. Within a few days after the accident, the company made a report thereof to the commission. On October 30, 1924, Dr. Hubbard performed an operation on the applicant. The operation consisted in the separation of numerous adhesions of the intestines. The applicant remained under the care of Dr. Hubbard until December of 1925. From the report made by Dr. Hubbard to the commission as to the condition of the applicant's health, it seemed for a time after the operation of October 30, 1924, that he was on his way to recovery. On June 30, 1925, Dr. Hubbard reported that the applicant was able to do light outside work. On December 3, 1925, the doctor reported that he had made X-rays and that the applicant had chronic intestinal obstructions; that there was delayed emptying of the stomach and intestines; that in time another operation would be necessary to separate the intestinal adhesions, but that the applicant was and since September 15, 1925, had been able to work. The applicant complained of constant pain in his abdomen during the time he was under the care of Dr. Hubbard.

On January 15, 1926, the applicant, with his interpreter, appeared before the commission and a medical advisory board consisting of Drs. Ralph C. Pendleton, L. M. Ossman, A. Jack Hosmer, and Martin C. Lindem. Dr. James P. Kerby was also present during the examination with X-rays of the applicant. The doctors were all of the opinion that the intestinal adhesions of the applicant were not such as to prevent him from working, and also that such adhesions probably did not account for the pain complained of by him. From what was said during the course of the examination, it seems that some of the doctors doubted the reality of the pain concerning which the applicant complained. As a re-

sult of the examination made by the medical advisory board, it was deemed advisable to place the applicant under observation in a hospital. The company consented to pay for hospitalization and for further medical treatment. Accordingly, he was placed in the Holy Cross Hospital at Salt Lake City, Utah. The services of Dr. William T. Ward were secured to observe and examine the applicant and to report his findings to the commission. Under date of February 4, 1926, Dr. Ward reported to the commission. The report gave a history of the case, a statement of his behavior while at the hospital, and of the condition of his health. The doctor stated that while at the hospital the applicant walked slowly and always held his hand on his abdomen. He complained of pain in his stomach, and expressed a willingness to undergo an operation to ascertain, if possible, the cause of the pain. Dr. Ward was unable to account for the pain. He stated in the report that a "malingerer is sometimes hard to convict. I am suspicious of this man and yet I am not sure enough to condemn him. I would advise further study and observation, even exploration if after a time he does not show definite improvement. His failure to learn the language in eleven years, his lack of thrift, his failure to apply for citizenship, are points against him. If some tentative settlement could be arranged and he be put on his own responsibility for a period of further observation, the truth might be determined." On February 25, 1926, the commission wrote two letters; one to the applicant, and one to the company. In the letter to the applicant the commission informed him that they were unanimously of the opinion that he was not suffering any disability as a result of his injury; that the commission would, however, urge the company to pay him compensation up to February 24, 1926; that if the company would settle on that basis such settlement would be very generous; that he should accept the same and give the company a discharge and release. In the letter to the company, the commission stated that they did not believe the applicant was suffering any disability, but

urged the company to pay compensation up to February 24, 1926, and upon the payment of such compensation to give the applicant to definitely understand that he would receive no further compensation on account of his injury. The company paid the compensation as suggested by the commission. The applicant executed and delivered to the company a full and complete release of "any and all claims, demands or causes of action that exist or may hereafter accrue" against the company.

On May 4th the company filed with the commission a statement of money paid as compensation to the applicant and of money expended for and in his behalf. The statement shows that the applicant at that time had been paid $1,265 as compensation, and $1,075.25 had been expended for medical attention and hospitalization.

Under date of July 2, 1926, the commission again wrote to the company. The following is quoted from the letter of that date:

"We desire to state that Henry Haataja called upon the Commission with his interpreter, Anton Hill, yesterday, July 1st, and complained that he still suffers as the result of his injury. * * * It was recommended that Haataja be paid a lump sum and a release taken, the object and purpose of this lump sum payment being to rule out, if possible, the psychic element, it being the opinion of the Commission that if the man was a neurotic a lump sum settlement might cure him. In view of the fact that he has returned, the Commission feels that another examination at this time might be enlightening and either confirm definitely Dr. Ward's opinion that Haataja is a malingerer, or pathology might at this time be elicited which would account for his complaint and symptoms. We therefore recommend that you refer Mr. Haataja for re-examination, either to Dr. Ward or to some other competent physician and surgeon and after such examination is made and the report received that you call upon the Commission and advise us as to whether or not you are willing to assume further liability in the case."

On July 3, 1926, Dr. Ward rendered another report to the commission concerning the condition of the applicant's

health. After stating what he had learned and observed since the former report, Dr. Ward observed that,

"I believe this man is and has been completely disabled since his accident. The more I have observed the abdomen the more I feel that there may be a real reason for his pain. The separation of the muscles at the scar, the persistent dullness in the right mid and lower abdomen, the tenderness over this area, the long disability in a young man, are factors which to my mind would justify surgical exploration."

Upon receipt of Dr. Ward's report, the commission again wrote to the company urging it to "assume liability, bring this man's compensation up to date and give him such medical treatment as the case seems to indicate."

In September, 1926, the company made arrangements with the Mayo Clinic of Rochester, Minn., to have the applicant examined to ascertain, if possible, the nature and extent, if any, of his disability. Accordingly he was sent to that institution at the expense of the company. Under date of October 12, 1926, the Mayo Clinic reported, among other things, that "the X-ray studies of the stomach and colon were normal. In surgical consultation we felt that as this man had gone through very serious surgical procedure with a fortunate result, it would be questionable if it would be well to reopen him very soon. * * * We advised him to return home and urged him to resume work, although necessarily he will not be able to undertake heavy manual labor." Some months later the applicant was again sent to the Mayo Clinic. The report of the second examination by the Mayo Clinic was similar to the first report. After his return to Salt Lake City from his first trip to the Mayo Clinic the applicant was examined by Dr. A. J. Hosmer, who reported that "after repeated examinations, while I believe the man's mental condition is not good, I do not consider him a malingerer. I cannot get away from the idea that he has some mechanical trouble that produces pain in his abdominal cavity. I recommend an exploratory operation in addition to curing his ventral hernia."

Under date of December 1, 1926, the company wrote a letter to the commission protesting against paying any additional compensation to the applicant. In the letter, attention was called to the fact that the company had made a settlement with the applicant as recommended by the commission, and that he had given the company a final release. The company stated, however, that it was willing to pay for another operation as recommended by the doctors. It also requested that the applicant be brought before the medical advisory board and given a complete physical and mental examination with a view of determining the reasonableness of an operation as recommended by Drs. Hosmer and Ward. Pursuant to the request, the commission notified the applicant, Drs. Ward and Hosmer to appear at the office of the commission at the state capitol on January 6, 1927. A representative of the company appeared at the time and place stated in the notice, as did also Dr. Ward. Neither the applicant nor Dr. Hosmer appeared. Dr. Ward was sworn and testified. In the main, his testimony was a restatement of what he had theretofore reported to the commission. He stated that in his opinion the applicant was totally disabled from performing manual labor. He recommended that the applicant submit to an operation. On March 7, 1927, the commission advised the company by letter that it "does not feel in this case like writing a formal decision, as the entire record of the case indicates very clearly that the man at this time is incapacitated from employment of any kind. It further discloses the fact that his condition can in all probability be improved by a further surgery. The record is so plain * * * that the Commission, instead of making a formal decision, is requesting that you tender to Mr. Haataja an operation for his hernia and that at the same time the hernia is operated an exploration be made into the abdomen for the purpose of correcting any pathological conditions which may be found at that time." On April 29, 1927, the applicant called on the commission pursuant to advice from the company. He was advised by a member of the commis-

sion to go to the company's mine where he would be given light work, either picking bony or sprinkling the mine. On May 21, 1927, the superintendent of the company's mine reported to the commission that the applicant came to the mine on about May 4, 1927; that he was offered a job sprinkling the mine or picking bony, but he refused to consider either job, stating that he could not do anything but walk around. On June 2d following, the applicant again called on the commission and was again advised to go to work for the company. He again went to the company's mine. Dr. D. S. Shelby thus reports what he did on that occasion:

"On Monday, June 6th, the patient went to work on the tipple, ate his lunch about 12:30 and started vomiting. The first-aid man brought him to the hospital here on a stretcher. Dr. J. B. Tuttle examined him here at the Standardville hospital very carefully and found nothing wrong with him. Temperature, pulse, heart, and lungs were all normal. Dr. Tuttle advised him to be more careful of his eating, especially regarding such large amounts. He left the hospital here that same afternoon about 4:30 p. m. voluntarily. On June 7 he came back to see me. All I could advise him to do was to return to work and eat less. I suggested he eat a very small amount about every two hours and not large meals at all. It has been my impression from watching him that he has fully decided in his own mind that he will not work, and accordingly goes around carefully holding his hand on his belly and wearing a face about two feet long. I have often wondered if this man was not suffering from a psychycopathic trouble."

The next time we heard of the applicant he was under the care and observation of Dr. Ralph T. Richards of the Salt Lake Clinic. Under date of June 24, 1927, Dr. Richards reported that

"we have carefully gone into all details of this case, including X-ray examination. Our conclusions are as follows: (1) There is no functional trouble with the stomach as the result of the injury of June 18, 1924. (2) There is a weakness of the abdominal walls as a result of the operative incisions. The weakness is not sufficient to justify further operation. (3) Four blood pressure observations show that this man has a blood pressure ranging above normal. (4)

There is a small amount of albumen in the urine but no microscopic evidence of serious kidney trouble. (5) This man has a seriously infected mouth from too much conservative dentistry. Our recommendations are as follows: That he have his mouth pathology cleaned up. At the conclusion of that treatment he should be re-examined for the condition of his blood pressure and kidneys. This man is in condition to do light work. I do not believe that a stooping job is desirable for him. If he could have a job which would require sitting or standing in an upright position, his abdomen would be more comfortable and I think he could tolerate the work sufficiently well to earn his salary."

On July 11, 1927, the company again wrote the applicant tendering him employment at the mine picking bony. It was explained to him that arrangements would be made so that he could sit down to do his work. It was also explained that all who worked picking bony from coal moving on a table experienced dizziness for a few days, but that such dizziness soon wore away. Again the applicant refused employment because, as he claimed, he could not perform the work required of him by the company.

On July 16, 1927, the applicant sent a written communication to the commission requesting that he be given a formal hearing of his case, and that he be awarded further compensation. The commission fixed August 8, 1927, as the date when a hearing would be had on the application, and notice thereof was given to the parties interested. Apparently the parties did not wait until the date set for the hearing. They appeared before the commission on August 1st. At that time the parties agreed that the applicant be forthwith taken to the hospital and there placed under the care and observation of Dr. Ward. The applicant agreed that if, after further observation and examination, Dr. Ward deemed it advisable to operate on him he would consent to the same. The company agreed to pay the expenses of hospitalization together with medical and surgical attention, and also to pay the applicant his back compensation and to continue to pay him compensation until such time as he was able to leave the hospital.

On August 8, 1927, the applicant was operated upon by Dr. Ward . A report of the operation which was filed with the commission shows that some of the applicant's intestines were "matted together and broadly adherent to the anterior abdominal walls across the upper abdomen and over the gall bladder region." Apparently the operation did not accomplish all that was expected. In a report of Dr. Ward under date of October 3, 1927, he stated that it appeared that he was not through with the difficulties; that it seemed likely that another attempt should be made to relieve his condition by a further operation to again free the adhesions of his intestines. On October 14th, Dr. Hosmer was called in to see the applicant. He felt that an operation should be undertaken immediately for relief of the partial obstruction in his intestines. During the period of convalescence, and after he left the hospital, the applicant refused to submit to a further operation. He continued to complain of pains in his abdomen. Dr. Ward continued to make periodical reports of the condition of the applicant up to June, 1928. It appears from the reports that he was slightly improved. He continued to complain of pain about the abdomen, especially after meals. He lived on light foods, such as milk, milk toast, soup, oranges, cereals, rice puddings, and eggs. Severe pain seemed to follow if he ate solid foods.

On July 10, 1930, the applicant again wrote the commission requesting the commission to fix a date for a hearing of his case. In the communication he stated that he was unable to do any sort of work to enable him to earn a livelihood, and that he was permanently and totally disabled. He requested that he be awarded compensation accordingly. On August 30, 1930, another hearing was held before the commission. The applicant testified that he was able to walk around town excepting when he had a severe attack of pain; that he could not sit in the same position for any considerable length of time; that it was difficult for him to sit up straight; that he had pain in his abdomen; that it was difficult for him to go up and down stairs; that he fainted when

he overexerted himself; that he could not stoop over and pick up anything from the floor; that if it was necessary to pick up anything from the floor he got down on his knees; that he could not lift anything, such as a chair, without suffering pain; that he could not eat solid foods such as meats and vegetables; that if he ate solid foods it pained and burned; that he ate toast soaked in coffee, soup and soft boiled eggs, and occasionally ice cream and a piece of pie; that he drank milk and coffee; that at times he slept fairly well but at other times he was unable to sleep; that he was born in Olu, Finland, in 1886; that he had been in America seventeen years; that while in Finland he worked in a sawmill and a slaughter house; that after coming to America he worked in coal mines until he received his injury; that he was not married and his parents were dead; that he tried to pick bony for the company but fainted and was unable to do that work; that he was in worse condition than at the time he tried to pick bony for the company; that he was and since his injury has been unable to do any work.

Dr. W. T. Ward was called as a witness by the commission. He gave a detailed description of the physical condition of the applicant at the time of the hearing and of his condition since he was last operated upon. The doctor stated that the applicant was growing progressively worse; that the disability of the applicant was caused by the injury which he sustained while in the employ of the company; that he was suffering from plastic peritonitis which tends to spread, and that the adhesions of his intestines in time would become firm and solid and progressively interfere more and more with the intestinal functions; that he should not eat solid foods; that taking into consideration the applicant's present condition he would not advise further surgery; that in his opinion the applicant would get progressively worse; that the physical condition of the applicant was such that he could not engage in remunerative employment of any kind, but he might be able to do such work as to tie flies for fisherman or wrap fish poles.

T. T. Brown, the manager of the welfare department of the company, testified that he had seen the applicant walking erect with his hands hanging by his sides; that when the applicant saw him (Mr. Brown) he immediately placed one of his hands over his stomach; that the applicant came regularly to the office for his compensation; that the company had paid him $4,992 in compensation and had also paid for his use and benefit in hospitalization, medical attention, and other expenses the sum of $2,373.69, making a total of $7,365.69.

On September 24, 1930, the company filed with the commission an answer to the application for compensation. In the answer objection was made to the commission entertaining the application for further compensation because the company had paid to the applicant the sum of $4,992, or $16 a week for a period of 312 weeks, and in addition to that had paid all medical, hospital, and other expenses as required by law. It was further averred in the answer that the applicant was not permanently and totally disabled, but on the contrary was and for two years last past had been able to work. The company further stated in its answer that without waiving its contention that the commission was without jurisdiction it offered to place the applicant in a hospital at its expense for a period of not to exceed three weeks and to pay for his medical attention, care, treatment, and observation, and also to pay compensation up to and including the time that he remained in the hospital.

Pursuant to the offer contained in the company's answer, the applicant consented to go to the hospital and to permit physicians selected by the company to examine him. He requested that Dr. Ward be permitted to be associated as an observer. On September 25, 1930, the applicant again went to the Holy Cross Hospital. He remained at the hospital under the observation of four doctors until October 25, 1930. On November 6, 1930, another hearing was had before the commission. As soon as the cause was called for hearing, counsel for the company objected to the taking of

any further testimony in the cause upon the ground that the commission was without jurisdiction to make any further award of compensation. At that hearing, Drs. Guy Van Scoyoc, James P. Kerby, George A. Cochran, and W. T. Ward testified. Three of the doctors, Guy Van Scoyoc, James P. Kerby, and George A. Cochran, testified concerning their observations of the applicant during the period he was in the hospital between September 26 and October 25, 1930. Their testimony was to the effect that after the applicant ate his meals his abdomen became distended and remained so much longer than in the case of a normal stomach; that the delay in empting of the stomach was doubtless caused by adhesions or bands which prevented the food from passing from the stomach into the intestines; that there were probably adhesions in his intestines which tended to retard the passage of the food through them; that these obstructions to the passage of the food were the cause of the pain which the applicant experienced after each meal, especially when he ate solid food; that the applicant had high blood pressure, an enlarged heart, and some albumen in his urine, which later ailments could not be said to be caused by his injury. They were of the opinion that an operation would probably relieve the applicant and may result in a cure of his abdominal troubles. The operation proposed was to open up the abdomen and, if possible, remove the adhesions, and, if the adhesions could not be removed, to perform a gastroenterostomy, which one of the doctors explained is "where we short-circuit the stomach directly into the small bowels rather than let it come out of the pyloris. You make a hole in the bottom of the stomach and suture it to the small bowel." The doctor further stated that such an operation is considered a serious operation, but many such operations are successfully performed. The doctors were all agreed that the applicant should confine his diet to liquid or semiliquid foods. Touching the question of the disability of the applicant, Dr. Van Scoyoc was asked, "Would you say that this man at this time was totally dis-

abled?" and he answered. "I would think so at the present time." On his redirect examination Dr. Van Scoyoc was asked, "So he has not in your judgment reached the point of total disability? There are possibilities of his performing work?" He answered, "If this pain is as bad as he says it is,—it is a question whether a fellow could keep his mind on what he was doing if he was having a lot of pain." Dr. Kerby was asked the following questions, and gave the following answers:

"Q. Now taking that into consideration would you expect this man to be able to engage in employment whereby he would have to be on the job for a period of eight hours in any kind of employment? A. From my observation of this man I doubt if he would be able to pursue a gainful occupation.

"Q. Of any sort? A. Of any sort that I know anything about."

On the redirect examination of Dr. Kerby, these questions were asked and these answers given:

"Q. Would you expect yourself, putting yourself in his condition with your intelligence, if you could find some light employment where you could sit down at a bench or in a chair and use your eyes and ears, and hands and arms, you could earn something for yourself? A. I would try pretty hard. But when I made my answer I was considering the individual and his makeup from the limited opportunities I have had to observe him.

"Q. When you say 'this individual and his makeup' what do you mean? A. That is going off on a long discussion. I don't think this man has the energy or the initiative that I have. I would try to find something I could do or bust myself trying, but you can't expect a man of his makeup to do it.

"Q. There is no desire to do it? A. None that I have been able to find.

"Q. He has no ambition or desire to do any work? A. No."

The following is quoted from the testimony of Dr. Cochran:

"Q. If he took smaller meals and more frequently he would still have less distress would he not? A. I think there is no question but what he could take liquid or semi-liquid food and take them more frequently and probably have a fair degree of nourishment.

"Q. So that he could then perform light work, that is if he wanted to work? A. If he had a will to do it probably.

"Q. If there were employments given to him so that he could sit down and not have to travel around much and use his arms and hands and eyes? A. This is probably more due to pain or irritation.

"Q. From what you state and have stated Doctor I get the idea in my head that you think that his mentality or the condition of his mentality is such that it has a good deal to do with his being able to work? A. I should say that would be true.

"Q. If you were in this situation would you expect that you would be able to do some work? A. I don't think I would be satisfied to live on what the Industrial Commission would pay me.

"Q. You would expect to be able to do work? A. Yes.

"Q. You know you could do it don't you Doctor? A. I think so."

In Dr. Cochran's opinion, the condition of the applicant had probably become fixed.

Dr. Ward testified that the result of another operation on the applicant would be uncertain for two reasons:

"First the probable difficulties of approach to do reconstructive surgery, and of the possibility of the reestablishment of the adhesions and so on as the result of our further surgery. Then again the general condition of this man and the composite result of his own makeup plus what has happened to him."

He still has plastic peritonitis.

"While it may not be a progressive thing, although in this case I designate it a rather widespread generalized adhesive process involving the omentum, small and large intestines, anterior abdominal wall, and stomach. Such were present in 1927. Whether this has progressed from that point or receded at the present I am unable to say. I think the likelihood is from the information I gather today that it may be pretty well organized, and not now extending, and may have undergone some absorption, or it might be less extensive than in 1927, but still there."

On November 7, 1930, the company wrote the applicant offering to furnish him "such surgical, medical and hospital expenses as may be necessary for a further operation as suggested by Drs. Cochran, Van Scoyoc and Kerby." The

offer recited that it was made by the company "not because it had any obligation whatsoever so to do, but for the purpose only of rendering further assistance to you with the expectation that such suggested operation will restore you to your full health and vigor." Under date of November 11, 1930, the applicant declined for the present to accept a further operation. Thereupon the commission made the award complained of, and later denied the company's application for a rehearing.

It is upon the record and testimony thus summarized that the company contends that the award of compensation made by the commission in favor of the applicant should be annulled. Apparently the company does not rely upon the release which the applicant signed as constituting a bar to the award complained of. It will be noted that after the release was executed the commission requested the company to assume further liability. Evidently the company complied with the request because it continued to pay compensation for a number of years after it received the release. In the company's answer to the application for compensation, no mention is made of the release. In its finding the commission made no mention of the release. The company in its brief does not complain because the commission disregarded the release, nor does it here urge that the release is a bar to the award made by the commission. We therefore assume that the company does not rely upon the release, and we shall dispose of the cause accordingly.

The claims of the company, as we gather from its brief, are that the evidence does not support the finding of the commission that the applicant has sustained permanent total disability as a result of the injury, and that such disability as he now suffers is due to his refusal to submit to an operation, and that, therefore, the commission was without jurisdiction to make the award complained of. Such claims cannot be successfully maintained. This court in the cases of *Spring Canyon Coal Co.* v. *Industrial Commission*, 74 Utah 103, 277 P. 206, and *Utah*

*Fuel Co.* v. *Industrial Commission,* 76 Utah 141, 287 P. 931, has announced the test that should be applied in determining whether a person is or is not permanently and totally disabled. There is evidence in this case which, if believed by the commission, supports the finding that the applicant is totally and permanently disabled within the rule announced in the above-cited cases.

Upon two occasions this court has had before it for determination the question of under what facts and circumstances an injured employee must submit to medical or surgical treatment, or, in case of his failure to do so, lose his right to compensation. *Utah Copper Co.* v. ■ *Industrial Commission,* 69 Utah 452, 256 P. 397, 400; *American Smelting & Refining Co.* v. *Industrial Commission,* 76 Utah 503, 290 P. 770, 771. In the former case, it was held that the refusal of the deceased to submit to the amputation of his leg did not defeat the right of his dependents to recover compensation. In the latter case, it was held that the refusal of the applicant to submit to the reduction of a compound fracture of a finger precluded him from recovering compensation for the loss of the finger occasioned by his refusal to submit to proper treatment. In the former case, it is said:

"The essence of the rule is that an employee must not aggravate or prolong his injury or incapacity by his own unreasonable or arbitrary conduct. But what is unreasonable and arbitrary depends upon the circumstances of each particular case. When he is confronted with submitting to a serious or what is called a major operation, one involving danger to his health or life, the injured employee has a legal and moral right of election."

In the latter case, it is said:

"The general rule deductible from the adjudicated cases is this: If an injured employee unreasonably refuses to submit to proper medical treatment, and as a result his disability or injury is rendered greater or permitted to continue, then such disability or injury as is caused by the unreasonable refusal to submit to treatment is said to be attributed to the voluntary act of the employee and not to the

accident. In determining what constitutes a reasonable and what an unreasonable refusal to submit to medical treatment, the facts and circumstances of the particular case must be inquired into."

In this case the applicant has undergone three major operations. One immediately after his injury when the perforations of his intestine were sewed up, and two since that time for the purpose of relieving him of his pain. In the last two operations an attempt was made to correct the adhesions of his intestines, but neither resulted in any permanent relief. While some of the doctors advised a further operation, others doubted its advisability. Those doctors who advised a further operation were by no means certain that a permanent cure would result. Under such a state of facts, it cannot be said that the applicant unreasonably refused to take the risk of another major operation such as that proposed.

The award is affirmed.

CHERRY, C. J., and STRAUP, FOLLAND, and EPHRAIM HANSON, JJ., concur.